We're going to move to our second argument in the morning, which I understand is remote. OK, our second case is number 21-27-59, Lisa Nigro v. Indiana University Health Plan. And we'll begin with Mr. Sink. Good morning. Good morning, Robert. So, I appreciate the honor to appear before you. I'll try to make my comments as brief as possible. Obviously, I'm here to answer any questions. First of all, I want to address the issue of causation. The district court, when they decided the motion for summary judgment, they applied a pre-stop causation test. Specifically, the court said, Nigro has presented no evidence that any supposed analysts against women on the part of Dr. Sethezevam painted these female decision makers. The district court cited the case of Willis v. Barron County Auditor's Office, which is a 1997 causation case and predates Staub by 14 years. The district court, further to make the point very clear that they didn't follow Staub, the court said, Nigro ignores that the termination decision was not Dr. Sethezevam's alone. Indeed, four women, Hockaday, Bates, Christopher, agreed that Nigro's employment should be terminated on workplace concerns. What we know from the record is that leading up to Nigro's termination, Dr. Sethezevam presented two compliance that ultimately led to Lisa Nigro's termination. One complaint came from an anesthesiologist by the name of Dr. Aquaviva. Now, Dr. Aquaviva didn't make a complaint. He was approached by Dr. Sethezevam and asked to make a complaint. And the record is clear based upon Dr. Aquaviva's testimony. He saw absolutely no basis to present the complaint. He also testified that he felt as though Dr. Sethezevam was providing false information about Lisa Nigro to get him emotionally charged to file the complaint. The other complaint or concern that Dr. Sethezevam provided all the decision makers was a complaint from Dr. Julie Dunlop. Again, Dr. Dunlop is an anesthesiologist. She did not file the complaint similar to Dr. Aquaviva. She was summoned to Dr. Sethezevam's office. And when asked about what happened between she and Lisa Nigro, Dr. Dunlop merely said that she didn't see anything inappropriate. But that information was then provided to all the decision makers that ultimately led to Lisa Nigro's termination. What the United States Supreme Court said in Staub is if a supervisor performs an act motivated by animus, that is intended by the supervisor to cause an adverse employment action, then the employer is liable. And what Staub makes clear is that if the decision makers, who may have absolutely no animus on their own or individually, if they're relying upon tainted information, that meets the Staub test. And that is the evidence in the record that these complaints were being provided by Dr. Sethezevam. And clearly the Aquaviva and the Dunlop complaints were baseless. And they were false. They should never have risen to information provided for Lisa Nigro's termination. Mr. Seen, I'm sorry to interrupt you. I have a question for you. Here's what I find difficult about this, is what are the one or two pieces of evidence in the record that you can point us to, to suggest that the termination was based on her sex or gender? I have a hard time seeing it. The district court took a lot of care going through all of the evidence and the parties' respective arguments about that evidence. And I just, I don't see it. And that gets to the second part of my argument. And that is, the question is, is there a factual question or a question of fact as to whether Dr. Sethezevam harbored any discriminatory animus? Right, what, so, exactly. So what evidence would you point us to? I would point you to, first of all, the comparator evidence which the court disregarded. And in that regard, we cited two comparators. One was CAA1, and we cited him for several reasons. First of all, one of the basis that IUHP cites as a basis for NIGRO's termination was a complaint filed by Dr. Rescorla regarding a hypotensive patient. Similarly, the evidence is that CAA1, who had a significant history of substance abuse, was found in a patient's room, slumped over in a chair. The breathing tube or the LMA was hanging out of the corner of the child's mouth. It was unsecured, and when the attending anesthesiologist came in, she said that CAA1 was disoriented, laughed inappropriately, and she excused him from the room. Absolutely no investigation, no write-up, nothing with respect to him. Also... Hold on, I thought there wasn't... Wasn't CAA1 the person that was in... This was this whole business about a misuse or a waste of fentanyl, right? That was another... That's another event. The event that I just cited was the danger that CAA1 created for a pediatric patient that he was in charge of. Okay, and so how does that link to... How does that link to sex discrimination? So he, meaning CAA1, certainly his care of the pediatric patient was equally as serious, if not much more serious, than NIGRO's care when she treated a patient that was hypotensive and didn't tell Dr. Rescorla immediately that the patient was hypotensive. It infers, based upon what the attending physician observed with CAA1, that he appeared to be impaired and having a certified anesthesia assistant caring for someone who is disoriented is a very serious matter. So based upon seriousness, I believe that his conduct was equally, if not more serious than NIGRO's and NIGRO was written up  for a pediatric patient. Going further, the issue with the fentanyl, NIGRO reports that, she's written up. Ultimately, it's determined that her report was appropriate. CAA1 was never investigated and they were treated differently. Also, when NIGRO reports a huffing nitrous oxide incident regarding CAA1, and she was advised by the number two person, Dr. Johnson in the anesthesia department to make the complaint to Dr. Sedhasivan, NIGRO was written up, that being a basis against her. And again, CAA1 was never addressed. And the other comparator is Dr. Green. Now, obviously, Dr. Green's an anesthesiologist, NIGRO is a CRNA, their job duties are different, but they were both required to sign the protocol that applied to both of them regarding CAAs and CRNAs signing drug orders. Their basis for not signing it was the same. NIGRO, her position was, she didn't have prescriptive authority, it would be illegal for her to write perioperative drug orders. Green's argument was the same. Green had, according to the district court, very well bolstered arguments that supported his position, but the bottom line is they were bound by the same workplace protocol, they both took the same action, they refused or originally refused to sign it, NIGRO was disciplined over it, nothing happened to Dr. Green. Now, that coupled with the complaints of other females at the Riley Anesthesia Department who complained about their treatment of Dr. Set-Hazavam, Dr. Rescore was sounding the alarm about Dr. Set-Hazavam's conduct, I believe that all of that, under the Ortiz test, rises to the level of creating a question of fact to be determined by a jury. But doesn't the record also show that, what is her name, Ms. Christopher, Terry Christopher, I think, the HR supervisor, that she looked into this and concluded that Dr. Set-Hazavam was mistreating male and female employees alike. That is correct, Your Honor, but if you engage in discrimination against females and you also treat males differently, does that permit discrimination of one sex even though you may be mistreating some males? Well, I think your adversary would say as it cuts against an inference that the mistreatment of the female employees was on the basis of their sex and would just say this individual is not acting appropriately, not treating with the kind of respect that's expected in the workplace. Everyone, male and female alike, the decision to mistreat them doesn't have anything to do with their gender. Well, in this particular case, there were no males that were identified by Terry Christopher. There were multiple females that were identified. Yeah, but your client has not come forward and said we have a genuine issue of fact about whether men were mistreated or anything. To the contrary, she seems to be accepting that conclusion. And my point is that the moment that conclusion is accepted that he's mistreating men and women alike, it's very hard to see a jury issue on the basis of this particular point. Well, I respectfully disagree in that. The record is clear that we have females who have specific complaints about their mistreatment. We have no males who have come forward and identified any specific mistreatment. Terry Christopher's conclusion is about the men is without any specific basis as compared to the females. Okay, Mr. Saint, do you want to save the remaining minute for rebuttal after you hear from Ms. Martin? Yeah, thank you, Your Honor. You're quite welcome. Ms. Martin, good morning. Good morning, Your Honor. As we speak to the court, no reasonable jury could find in favor of Ms. Lisa Nigro without relying upon speculation and conjecture. And for this reason, summary judgment was required and is required in favor of my client, Apolli, Indiana University Healthcare Associates or IUHP as we refer to it and the district court should be affirmed. All of the things that we've been talking about so far, the context of the situation is key. Certainly we know that Ms. Nigro joined the Riley Anesthesia Division of IUHP during a time of significant conflict. And in that time, Dr. Sidhasivan had been tasked with introducing this new care team model. And in that care team model, the CRNAs and the CAAs, so the anesthetists, would be expected to take more of a leadership role in the operating room, still under the supervision of the anesthesiologists. And that did not sit well with several of the anesthesiologists, that particular new practice protocol. And as has been discussed this morning already, multiple anesthesiologists also expressed a strong dislike for the way Dr. Sidhasivan communicated with them generally. And so this is the important context in which we must construe all of the facts that Ms. Nigro brings forward now to try to craft the concerns raised about her behavior into sex discrimination. But even though the court must construe the facts in the light most favorable to Ms. Nigro, she also cannot ignore undisputed facts that would require summary judgment in this case. And to specifically look at the issue of comparators that counsel talked about a few minutes ago, and looking first at CAA1, the type of disruptive behavior at issue that led to Ms. Nigro's termination is key. And we look at the Abrigo versus Wilkie case, certainly for the proposition that coworkers without similar behavioral issues are not to be considered similarly situated. The fact that her anesthesiologist colleagues, who were her friends, vouch for her clinical skills or her good intent with respect to certain situations does not carry the day here. But even aside from the behavioral issues that were identified with respect to Ms. Nigro, and looking at the clinical issues that she is trying to compare herself side by side with CAA1, there's still not an apt comparison. The clinical issues, though certainly only a small piece of the puzzle that led to her termination, involve a failure to communicate promptly and properly with the physicians in the operating room in the situation that counsel referred to. And that led to an incident report being filed by Dr. Rescorla against Ms. Nigro, the first that he had filed in his long career. On the other hand, the information that we have about CAA1's clinical issues are unsubstantiated to a one. There is no admissible evidence of CAA1 with relationship to the nitrous oxide, to the wasted syringe of fentanyl. And the incident that Dr. Kritzmeier observed not only occurred after Ms. Nigro's termination, but also was reported too late for IUHP to do any meaningful investigation of that incident. And so leading to it being unsubstantiated as well. So CAA1 is not an apt comparator for Ms. Nigro. And in the same way, and even less so, is Dr. Morton Green. Dr. Green is not even a sole comparator in this sense. Ms. Nigro ignores that two other female anesthesiologists, Dr. Doris Hardiker and Dr. Stacey Kritzmeier, also oppose the practice protocol that would lead to the anesthetists having more responsibility in the operating room. And she has provided no evidence of Drs. Hardiker or Kritzmeier receiving any adverse action as it relates to the practice protocol either. So here we have an instance where men and women are treated more favorably than Ms. Nigro from her perspective. But what really is also less helpful for Ms. Nigro here is that she also was not subjected to any adverse action as a result of that practice protocol. And as the district court correctly found, the coaching memorandum in which that opposition to the practice protocol was listed was not an adverse action. It was in the nature of improving her performance. And during the course of her objections to that practice protocol, Dr. Sedhasivan didn't even threaten her in the sense that she is arguing it in her briefing, rather stating the simple fact that if she didn't sign the practice protocols, she wouldn't be able to work for IUHP. And she understood that that was the status and expectation that would be offered to her. She was offered time to further consider that practice protocol before signing. Melissa Hockaday provided some additional information to her and Nikki Block, the chief anesthetist, offered to talk with her about it. But Ms. Nigro ignored that offer and never provided anything specific to identify for Dr. Sedhasivan what her concerns were, which is why that was such a challenge for the department since she being the only anesthetist to hold out on signing it would create scheduling difficulties within the operating room to deal with those particular issues. And to further sort of put a cap on the issues with respect to the practice protocol, in her deposition, Ms. Nigro described the difference between the people who were making those different positions, opposition and favor for that practice protocol and separated them into people who liked the way things were versus people who didn't like the way things were once the anesthesiologists all went over to IUHP and that it was those anesthesiologists, in her view, that were being torn down, which were her words, so to speak. And so, again, that is not any sort of discrimination based on sex. Ms. Nigro also relies heavily, as was discussed just a few minutes ago, on her belief that other women were treated less favorably and that those beliefs were expressed in the course of interviews that were conducted by Terry Christopher and that department-wide review that was conducted. But, again, we are given nothing but speculation or conjecture here. The statement that people are having issues or that Dr. Sedhasivan has issues with women or that there is an appearance of preferential treatment does not go to sex discrimination. And it was, as has been noted, only Terry Christopher who sees the big picture, who heard all of the interview answers and was able to review that information and testified that both men and women expressed issues with Dr. Sedhasivan. And so, again, we're left only with Ms. Nigro's speculations with respect to what Dr. Sedhasivan meant or intended. Who was on this panel who finally reviewed this lady's conduct before final action was taken? What were their roles in the hospital? Who were they? Sure. So Dr. Sedhasivan certainly was part of that process. That was the first thing I wanted to make clear. He was part of the process. He was. So we're not making any sort of argument that he wasn't or, and that is why we've argued that the cat's paw or the proximate cause issue really is a non-issue here. Because Dr. Sedhasivan was involved. The chief nursing officer, Melissa Hockaday, was involved. We had human resources. Terry Christopher was involved. The chief anesthetist, Nikki Block, was involved. And Chanda Pritchard, who was in the practice administration for that anesthesiology group. So you had a lot of different perspectives looking into the issues that were raised with respect to Ms. Niagara's conduct. And each of them came to the conclusion that termination was appropriate, which from IUHP's view, really underscores the district court's finding that it was further persuasive that you have four female decision makers involved and also finding the same. Did some of those female members of the board report to the doctors? Is it Srinivasan, is that how he says his name? Yeah. Dr. Sedhasivan, Nikki Block, the chief anesthetist reported to him. But the rest of the three did not report to Dr. Sedhasivan. And Nikki Block, it should be said, and is revealed in the record, that she had a good working relationship with Dr. Sedhasivan. And with respect to the complaints being brought, I wanted to touch on that briefly. With respect to the complaints of Dr. Acquaviva and Dr. Dunlap, those were not, contrary to Ms. Niagara's position, those were not generated by Dr. Sedhasivan. Rather, Krista Merritt, another anesthetist, brought the concern of relating to Dr. Acquaviva to the attention of Dr. Sedhasivan or Nikki Block to share that particular concern of how she responded to Dr. Acquaviva in the operating room. And then Dr. Sedhasivan went back and asked for more information about that. In the same way, the concerns relating to Dr. Dunlap were relayed to Dr. Sedhasivan through Ms. Block. Do we have any information in this record at all as to why the anesthesiologist, responsible anesthesiologists, for the delicts of CAA1 in the patient's room never decided not to take the matter up the line? Was she deposed? Was anything taken? Do we have any information as to why she let this thing ride? Oh, she was not just deposed on that issue. And it's not clear why she would have let that sit. It seems strange that that hasn't been pursued. Well, and from our perspective, I think that that underscores the fact that it was not perceived at the time to be as serious of an issue because certainly an anesthesiologist who saw something that truly concerned them of the nature that Ms. Niagara has shared would raise that immediately and allow for an immediate investigation to unfold. But that didn't occur. And it comes up on appeal. It becomes, if not the 500-pound gorilla in the room, certainly the 100-pound gorilla in the room, doesn't it? It just seems strange that nobody pursued that. Yeah. And so with respect to just generally overall, I think it is important, not only the context that I've shared about the general unrest in the department, but the looking at the forest and the trees that are made up of speculation and conjecture, it's important to note that Dr. Sidhasavam is the one who brought Ms. Niagara to IUHP in the first place, which contributes significantly to her inability to avoid summary judgment. And it was not as if he had just heard of her in passing, but they worked together, and she admits they had a good working relationship. And no reasonable jury is going to believe that he asked her to come to IUHP, he hired her, he hired other female anesthetists, and then decided to terminate her employment because she was a woman. Ms. Martin, if I could interrupt so you could answer my question and still have time for your rebuttal, your summary. Could you explain to the court exactly what kind of background and educational professional qualifications these anesthetists have? That kept bothering me as I read your brief. Sure. So the anesthetist, like Ms. Niagara, she was a certified registered nurse anesthetist. And so she had the training of a registered nurse, as well as the advanced training of an anesthetist to put those degrees together. And so there was a group of- What degree? What kind of an advanced degree does she need for that position? The registered nurse would be beyond, would be certainly a bachelor's. I'm not sure what the anesthetist degree part is called, Your Honor. Do you know whether or not this program, which was implemented at Riley, or be attempted to implement at Riley, is this a program that is nationally being implemented? Was this a very unique thing to Riley, or is this something that is, in the profession of anesthesiology, is being accepted throughout the country? It is not unique to Riley, so it is a program that is elsewhere. I see. Thank you very much. Sure. And I think it's important to note one of the last things that Ms. Niagara said  so any future juror could hear this loud and clear, but she said, your VP, meaning Dr. Sudhasivan, is the people who wanted me to come here. And that is the truth. And he did so knowing she was a woman. She even told Dr. Sudhasivan in the course of her employment that she liked him, that she liked the way that he was doing things. But as her employment wore on, it became clear that her behavior had convinced her peers that she could not be trusted. I think another statement made by Ms. Niagara in her termination meeting was also insightful and apropos. And what she says is, you're getting rid of me because people don't like me. And while we do not dispute that this would be an upsetting thing to feel and to hear, it is not unlawful sex discrimination. And for all these reasons, this court should affirm the district court's judgment in favor of IUHP. Thank you. Ms. Martin, thanks to you. Mr. Saint, we'll return back to you for your rebuttal. I will move as fast as I can, Judge, in my minute and four seconds. Just want to pick up on something that Judge Scudder, that you had said and something that Ms. Martin responded to about Terry Christopher's observations that men had negative comments. Again, there was no specific specifics identified with the females. There were specifics. They identified that men were being treated better than them. So with respect to the men, we don't know if the men were upset about a scheduling problem. We don't know if it was something completely unrelated to gender. We don't know if they had arguments with them. We just don't know. It's pure speculation. And I think we can't do much on the women's side either, right? There's no evidence of comments that he was making in the course of mistreating people that were gender or sex-based. What the record shows is that he was rude and unprofessional, you know, et cetera. Plus, the complaints of the females about that men were being treated more favorably to them. And that was Terry Christopher's perception and observation that they were reporting gender discrimination against Dr. Santasi. Okay, very well. Thank you. Mr. Saint, thanks to you. Ms. Martin, thanks to you. The case is taken under advisement.